IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA       )
                               )
            v.                 )    1:12cr280 (JCC)
                               )
KWANG HEE KIM,                 )
                               )
      Defendant.               )


**M E M O R A N D U M    O P I N I O N**

This matter is before the Court on Defendant Kwang Hee Kim's

("the Defendant") Combined Motion and Memorandum to Suppress

Statements [Dkt. 65] ("the Motion").  For the following reasons,

the Court will deny the Motion.

### I. Background

A. <u>Factual Background</u>

On September 5, 2012, a grand jury returned a six-

count Superseding Indictment [Dkt. 1] charging four defendants

with offenses relating to their membership in the "Korean Night

Breeders," gang based in Fairfax, Virginia.  Defendant Kwang Hee

Kim, a citizen of the Republic of Korea, has been charged with

(1) conspiracy to commit extortion, in violation of 18 U.S.C. §

1951(a) (Count I); (2) extortion, in violation of 18 U.S.C. §

1951(a) & 2 (Count V); and (3) extortion, in violation of 18

U.S.C. § 1951(a) & 2 (Count VI).

Defendant moves to suppress statements made during a March 28, 2012 interview that was conducted by agents with Homeland Security, as well as any evidence derived either directly or indirectly from those statements. Defendant is further moving to suppress subsequent interviews conducted by agents with Homeland Security. The Government notes in its Opposition [Dkt. 72] ("the Government's Opposition" or "the Opposition") that the Government has stated that they do not intend to use Defendant's statements from the March 28 interview at trial. (Opp'n 1.)

B. Procedural Background

On October 4, 2012, Defendant filed the instant Motion to Suppress, as well as an accompanying Memorandum in Support [Dkt. 66] ("Defendant's Memorandum" or "the Memorandum"). On October 11, 2012, the Government filed a Response in Opposition. On October 31, 2012, Defendant filed a Reply to the Government's Response [Dkt. 83] ("Defendant's Reply"). An evidentiary hearing was held upon Defendant's Motion to Suppress on November 9, 2012 before this Court.

Defendant's Motion is now before the Court.

**II. Standard of Review**

The Fifth Amendment affirms the right that a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda,* the Supreme

Court determined that a suspect under custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination. *United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011) (citing *Miranda v. Arizona*, 384 U.S. 436, 478-79). To ensure compliance with this rule, incriminating statements elicited during custodial interrogation prior to *Miranda* warnings cannot be admitted at trial. *Id*.

However, any statement given freely and voluntarily without any compelling influences is admissible into evidence. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966). "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable .... Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *Oregon v. Elstad*, 470 U.S. 298, 305 (1985).

As previously stated, and of particular relevance to the factual scenario of the instant matter, the *Miranda* requirement is triggered by a custodial interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) ("A person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by *Miranda*."). Generally, any statements a suspect makes during custodial interrogation are inadmissible unless the

defendant received *Miranda* warnings.[1]  *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984).

### 1. Immigration and Nationality Act

Under Immigration and Nationality Act, any alien that is unlawfully present in the United States is deportable.  *See* 8 U.S.C. § 1227(a)(1)(B).[2]  An individual staying in the United States beyond the expiration date of their visa is unlawfully present in the United States and removable.  *See* 8 U.S.C. § 1202(g)(1); United States v. Francisco, 30 Fed. App'x 48, 49 (4th Cir. 2002).

The Supreme Court has "recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). An alien may be administratively arrested pending a decision on whether the alien is to be removed from the United States.  *See* 8 U.S.C. § 1226(a); *see United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010).  Rather than being an arrest for unlawful entry or a federal criminal offense, a deportation proceeding is a civil action to determine

---

[1] It bears mentioning that *Miranda* does not implicate all interactions that may occur between individuals and law enforcement officials.  For instance, Miranda does not extend "to on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process." *Miranda*, 384 U.S. at 478.

[2] As the Government rightly notes in its Opposition, although § 1226(a) states that the Attorney General shall issue the warrant, pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2193 (2002) (codified at 6 U.S.C. §§ 202(3), 251), the Attorney General's functions under this statute were transferred to the Secretary of the Department of Homeland Security. *See also* 8 U.S.C. § 1103; 8 C.F.R. § 2.1.

eligibility to remain in the United States. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984); *United States v. Drummond*, 240 F.3d 1333, 1335 n.3 (11th Cir. 2001). As the Fourth Amendment has been held to be applicable to illegal aliens, an immigration officer making an administrative arrest must have probable cause that the alien is unlawfully present in the United States. *Quintana*, 623 F.3d at 1239.

### 2. Law Applicable to a "Custody" Determination

An individual must be in "custody" before the *Miranda* requirement is triggered. *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010). The determination of whether an individual is "in custody" must be made on a case-by-case basis. *United States v. Jones*, 818 F.2d 1119, 1123 (4th Cir. 1987). As used in Supreme Court case law implicating *Miranda*, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). For Fifth Amendment purposes, "custody" exists in any circumstance where there is a formal arrest or where a reasonable person would perceive restraints on her "freedom of movement of the degree associated with a formal arrest." *Id.* (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a

reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. *Id*. (citations omitted). In order to determine how an individual would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Id*. (citing *Stansbury v. California*, 511 U.S. 318, 325 (1994)). The following factors, while not individually determinative, are often relevant to a custody determination: the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. *Id*. (citations omitted).

However, not all restraints on freedom of movement amount to custody for purposes of *Miranda*, and the Supreme Court has stated that determining whether an individual's freedom of movement was curtailed is simply the first step in the analysis and not the last.[3] *Id*. Indeed, the Supreme Court has recently stated that "(1) imprisonment, (2) questioning in private, and (3) questioning about events in the outside world—are not necessarily enough to create a custodial situation for *Miranda* purposes." *Howes*, 132 S. Ct. at 1189. Because rote application of the typical standard is of limited utility in a jail or

---

[3] The Supreme Court has stated that their "cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." *Maryland v. Shatzer*, 559 S.Ct. 1213, 1224 (2010).

prison setting where an individual may constantly endure restraints comparable to formal arrest, for an inmate, these restraints must be such that create a change in the inmate's surroundings which lead to additional constraints on her freedom of movement. *See United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985).

### 3. "Fruit of the Poisonous Tree"

In general, the exclusionary rule prohibits the admission of testimonial evidence gathered illegally. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). Courts will also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." *Id* at 488. The critical inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*.

However, the Supreme Court's holding in *Elstad* "makes clear that a failure to administer Miranda warnings, without more, does not automatically require suppression of the 'fruits' of the uncounseled statement." *United States v. McCurdy*, 40 F.3d 1111, 1117 (10th Cir. 1994) (quoting *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1517 (6th Cir. 1988)). Indeed, "[w]here the uncounseled statement is voluntary, and thus not a

7

product of 'inherently coercive police tactics or methods offensive to due process' ... there is no fifth amendment violation and the 'fruits' may be admissible in the Government's case in chief." *Id.* Furthermore, under the logic of the holding in *Elstad*, "[i]f the unwarned statement was voluntary, and the allegedly tainted second statement was also voluntary, the second, warned statement is admissible" since "[t]he Fifth Amendment ... prohibits only the use of compelled testimony." *Id.* (quoting *United States v. Wiley*, 997 F.2d 378, 383 (8th Cir. 1993), *cert. denied*, 510 U.S. 1011 (1993).

### 4. Sixth Amendment Right to Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207, 115 L. Ed. 2d 158 (1991). The Supreme Court has held that held that once the right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective. *Id.* (citing *Michigan v. Jackson*, 475 U.S. 625 (1986)).

The Sixth Amendment right, however, is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, "'at or after the initiation of adversary judicial criminal

8

proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id* (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). Even though an accused has a Sixth Amendment right to counsel for one offense — because formal charges have been brought — the right does not automatically attach to other offenses with which he has not been charged. *United States v. Alvarado*, 440 F.3d 191, 196 (4th Cir. 2006). Furthermore, the Supreme Court has delineated the contours of the Sixth Amendment right to counsel as such:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever — by luck or happenstance — the State obtains incriminating statements from the accused after the right to counsel has attached.

*Maine v. Moulton*, 474 U.S. 159, 176 (1985).

### III. Analysis

### 1. March 28, 2012 Interview

### a. Lawfulness of Detention

The Court will first address the lawfulness of Defendant's detention. A native of South Korea, Defendant Kwang Hee Kim entered the United States on or about August 10, 2000 as the holder of a B-1/B-2 nonimmigrant visa and was admitted to the United States for a period not to exceed six months. (Ex. 7.)

On or around January 9, 2012, Immigrations and Customs Enforcement ("ICE") Officer Jason Klepec received notification that Fairfax County Police queried ICE's Law Enforcement Support Center in order to determine Defendant's immigration status. The information contained in this notification caused Officer Klepec to believe that Defendant was an alien subject to removal. Shortly thereafter, Officer Klepec conducted a video interview with Defendant, during which Defendant provided certain biographical information and information relating to his entry into the United States in 2000, and in the process providing a significant amount of information concerning his immigration status within the country at the time. (Ex. 1.) Subsequent to that interview with the Defendant, Officer Klepec and other officers also queried immigration databases, which revealed further biographical information regarding Defendant and showed that he entered the United States using a visitor's visa that had expired in 2001 and that he had not been granted any immigration benefits that would allow him to remain in the

United States.  (Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8.)  As a consequence of the information gained through the entirety of ICE investigation into Defendant's immigration status within the United States, a warrant was issued for the administrative arrest of Defendant, which was returned executed on March 21, 2012, when Defendant was released by Fairfax County, where he was being held on pending drug charges, into ICE administrative custody. (Tr. 112:2-5; Ex. 7.)  The Court notes that Defendant is represented by counsel as to those drug charges.  Ronna Rossi, record supervisor of Rappahannock Regional Jail, a facility that has a contract with the federal government to hold ICE detainees, testified that Defendant was present at that facility continuously until March 28 of the same year.  (Tr. 111:15-112:9.)

Based upon the foregoing information in the record, this Court is satisfied that ICE had probable cause both to issue the warrant for Defendant's administrative arrest, as well as to seize the Defendant for the purpose of detention. Consequently, this Court does not find that Defendant was unlawfully seized or detained.

**b.** Whether "Custody" Existed for *Miranda* Purposes

The Court will next address whether Defendant was "in custody" for the purposes of triggering the *Miranda* requirement.

Regarding the circumstances the precipitated the March 28 interview, Special Agent Marc Armstead testified that, in January of 2012, he was told by a local Fairfax County police officer that Defendant Kim was a local drug dealer that he suspected knew Han Sa Yu, also known as "Thunder," who was then under investigation by federal authorities. He did not indicate that Defendant Kim was part of Thunder's gang. (Tr. 35:3-36:-8; 10:1-7.) Special Agent Armstead testified that he spoke with an enforcement removal officer in the Immigration Customs Enforcement division about arranging a meeting with Defendant Kim. (Tr. 10:20-12:12.) Special Agent Armstead testified that, on the day of the interview, he did not suspect that Defendant Kim had committed extortion or participated in a conspiracy to commit extortion. (Tr. 10:8-19.)

The interview in question occurred at the United States Citizenship and Immigration Services offices in Fairfax, Virginia. (Tr. 12:25-13:3) Special Agent Armstead testified, on the morning of March 28, at approximately 10:30, that he brought Defendant out of the holding cell, placed him in handcuffs, and showed him to the interview room. (Tr. 40:7-21.) Special Agent Armstead testified that Defendant agreed to participate in the interview. (Tr. 16:2-3.) Present at the interview were Special Agent Armstead, Special Agent Mullins, and Defendant Kim. (Tr. 14:1-5.) Defendant was not handcuffed

or physically restrained during the interview.  (Tr. 14:15-16.)
In the estimation of Special Agent Armstead, the interview took
approximately one hour and twenty-five minutes.  (Tr. 14:20-21.)
Special Agent Armstead testified that the interview occurred in
a carpeted, well-lit, relatively comfortable interview room that
is used for interviewing both witnesses and suspects, and that
Defendant Kim was seated for the length of the interview in an
ergonomic chair. (Tr. 13:13-19; 14:24-15:7.)  Special Agent
Armstead testified that the agents explained to Defendant Kim
why they wanted to interview him and assured Defendant Kim that
he was not required to speak with them.  (Tr. 15:8-12.)  Special
Agent Armstead testified that at no time did Defendant Kim
indicate that he did not want to speak with the agents.  (Tr.
16:4-6.)  Defendant Kim was not read his *Miranda* rights.
Special Agent Armstead testified that this was due to him not
being a suspect in the offenses that were the subject of the
interview. (Tr. 15:23-16:1.) It was represented that Defendant
never asked for any attorney.  (Tr. 20:13-14.)  Special Agent
Armstead testified that Defendant was not told that he would not
be prosecuted because he did not have any information indicating
that he had committed any crimes besides a pending state drug
charge.  (Tr. 18:4-11.)  Defendant never asked if he would be
prosecuted federally. (Tr. 18:14-16.)  Special Agent Armstead
stated that they told Defendant that they did not want to hear

about any crimes he had committed, relating to drugs or other matters, and that they actively prevented him from mentioning offenses that he himself had committed. (Tr. 15:13-22.) However, during this interview Defendant made several incriminating statements. (Ex. 12.)

Special Agent Armstead's testimony reflected that the tone of the interview was cordial and non-threatening. (Tr. 16:7-17:8.) Special Agent Armstead testified that the agents' respective demeanors were "pleasant and friendly." (Tr. 16:15-18.) There is no indication from the testimony that was proffered that Special Agent Armstead or Special Agent Mullins used any harsh language with Defendant. (Tr. 17:7-8.) Special Agent Armstead testified that Defendant Kim himself was "pleasant" and mostly quiet during the interview. Defendant Kim did not refuse to answer any questions. (Tr. 20:5-8.) Special Agent Armstead testified that the agents did not coerce Defendant in any way, psychologically or otherwise. (Tr. 16:10-11; 18:1-2.) He stated that the agents did not lie to Defendant Kim or use any sort of deception in questioning him, and that Defendant was not threatened with adverse consequences, violence, or harsher confinement if he did not speak to them. (Tr. 16:7-8; 16:12-14; 17:21-25.) Special Agent Armstead further testified that no weapons were displayed during the interview and he was not armed. (Tr. 17:5-6; 17:9-11.) He also testified that he did

not deprive Defendant of food, sleep, or water, and that he did not ask anyone to do so. He further testified that Defendant did not complain that he was tired or he had not had enough sleep. (Tr. 17:12-20.)

Defendant was ultimately informed that he would be returned to administrative custody at the conclusion of the interview, and Defendant was not arrested once the interview was over. (Tr. 20:15-21:1.) He was also allowed to use the restroom and drink water both before and after the interview, although he declined to do so. (Tr. 14:13-14.; 21:5-7.) Special Agent Armstead testified that the only question asked by the Defendant during the entire interview related to his immigration situation going forward. (Tr. 19:25-20:4.) After the interview was over, Defendant Kim was placed into handcuffs and returned to detention facility in the same building. (Tr. 21:1-2.)

In short, the environment into which Defendant was placed cannot be said to have been one in which there was a serious danger of coercion. Indeed, rather than creating a change in the Defendant's surroundings which led to additional constraints on his freedom of movement, the position in which Defendant was placed actually resulted in less constraint. A reasonable person in Defendant's position would have understood that he was free to terminate the interview. This Court finds that Defendant was not in custody for the purposes of *Miranda*.

Under such circumstances, Defendant could not have been entitled to the protections provided by *Miranda*, and indeed Defendant was informed as much. *See Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000) (citing *United States v. Bautista*, 145 F.3d 1140, 1147 (10th Cir. 1998) ("Thus, in order to implicate the *Miranda-Edwards* right to counsel prophylaxis, both a custodial situation and official interrogation are required."), *cert. denied*, 525 U.S. 911 (1998).

Defendant's counsel has cited the Supreme Court's holding in *Missouri v. Seibert*, 542 U.S. 600 (2004) as warranting the suppression of Defendant's statements for failure to administer *Miranda* warnings. This case is factually distinguishable from *Seibert*. *Seibert* involved withholding *Miranda* warnings until after a custodial interrogation and drawing out a confession, then giving the warnings, and then repeating the question until the already-provided confession was repeated. However, as this Court has stated in the foregoing, Defendant was not in custody for purposes of *Miranda* and could no avail himself to its protections. Unlike the case in *Seibert*, Defendant's statements in the instant case were not coerced, or made in a coercive environment.

### c. "Fruit of the Poisonous Tree"

As there was no illegality or impropriety to the March 28 interview with the Defendant, there is no taint to the

material associated with the interview.  Consequently, evidence gained through Defendant's statements in that interview cannot be considered "fruit of the poisonous tree."  In the foregoing analysis, this Court has found that Defendant was not in "custody" for the purposes of *Miranda* and could not invoke its protections.  Indeed, the record demonstrates that Defendant's statements were made voluntarily in a non-custodial setting. This Court is not prepared to suppress any material gained as a consequence of Defendant's statements on that day on this basis of it having been "fruit of the poisonous tree."

### d. Right to Counsel

As the Court has found that the interview of Defendant was not a "custodial interview," and that Defendant was not questioned about any crime with which he had been formally charged, the right to counsel had not attached. Indeed, Defendant had not been formally charged in the present case at that point.  There is no basis upon which to assert that Defendant's Sixth Amendment right to counsel was violated for the purposes of the present proceeding, as the right to counsel had not yet attached.  Furthermore, simply because Defendant voluntarily made statements about his drug activities does not necessitate the suppression of the present material.  As the Supreme Court has stated:

> The police have an interest ... in
> investigating new or additional crimes
> [after an individual is formally charged
> with one crime.] [T]o exclude evidence
> pertaining to charges as to which the Sixth
> Amendment right to counsel had not attached
> at the time the evidence was obtained,
> simply because other charges were pending at
> that time, would unnecessarily frustrate the
> public's interest in the investigation of
> criminal activities.

*Maine v. Moulton*, 474 U.S. 159, 180 (1985). There is simply no

evidence in this case the Court knowingly circumvented

Defendant's right to counsel. Defendant's counsel attempts to

invoke *McNeil v. Wisconsin*, 501 U.S. 171 (1991), as a basis upon

which to argue that Defendant's Sixth Amendment right to counsel

was violated. However, as *McNeil* explicitly states, the Sixth

Amendment right is offense specific. Further, *McNeil* cites this

aspect of *Moulton*. There is simply no circumventing the fact

that "[i]ncriminating statements pertaining to other crimes, as

to which the Sixth Amendment right has not yet attached, are, of

course, admissible at a trial of those offenses." *McNeil,* 501

U.S. at 176 (citing *Moulton*, 474 U.S. at 180). In the instant

case, Defendant's statements were made voluntarily in a non-

custodial setting, and Defendant did not request an attorney, or

the attorneys he had retained for the purposes of other

proceedings.

Defendant's counsel also cites *Texas v. Cobb*, 532 U.S.

162 (2001), in support of his argument that Defendant's Sixth

Amendment right to counsel was violated for the purposes of the present proceeding. However, Defendant's reliance is considerably misplaced. That case expressly states that "it is critical to recognize that the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses." *Cobb*, 532 U.S. at 171-72. Furthermore, to the extent that Defendant relies on *Cobb*'s "same offense" analysis in the present case, if at all, there is nothing that would lead this Court to believe that the federal offenses of extortion and conspiracy to commit extortion constitute the "same offense[s]" as the charges in the drug case that is pending in Fairfax County.

<u>May 25, 2012 Interview</u>

According to Special Agent Armstead, this interview was arranged by Special Agent Brendan Shelley. He testified that it was his belief that it was arranged through Defendant's immigration attorney. It took place in the parking lot of the International House of Pancakes in Centreville, Virginia. Present at that interview were Special Agent Armstead, Special Agent Shelley, and Defendant Kim. (Tr. 22:13-23:3.) The Defendant chose the location for the interview. (Tr. 23:20-21.) According to Special Agent Armstead, the interview lasted approximately thirty minutes. (Tr. 24:15-16.) Special Agent

Armstead stated that Defendant was neither in custody, nor handcuffed, nor arrested during or after of the interview. (Tr. 23: 1-6.) Special Agent Shelley also testified that Defendant was not handcuffed during the interview, or arrested or pursued at its conclusion. (Tr. 77:15-78:2.)

According to Special Agent Shelley, the agents were "relaxed," "cordial," and "friendly" in demeanor, and the agents did not raise their voices at Defendant Kim or use profanity. (Tr. 78:3-11.) Special Agent Armstead also stated that the Defendant was "friendly." (Tr. 25:14-15.) He stated that Defendant did not object to the interview, nor did he refuse to speak with the agents or answer any questions. Defendant never asked for an attorney. (Tr. 25:14-22.) Special Agent Armstead also testified that the agents did not use profanity, raise their voices, or yell during the interview. (Tr. 24:22-25:2.) Special Agent Armstead testified that the agents' respective demeanors were "pleasant and friendly." (Tr. 24:17-21.) Special Agent Shelley testified that Defendant Kim's demeanor at the interview was "relaxed, very forthcoming, and cooperative" and that Defendant did not refuse to participate or ask for an attorney. He did not refuse to answer questions. (Tr. 78:23-79:6.) During this interview Defendant made several incriminating statements. (Ex. 13.)

Special Agent Armstead stated that no weapons were displayed during the interview and that Defendant was not psychologically coerced in any way. (Tr. 25:3-5; 25: 11-13.) He testified that the agents did not threaten Defendant with violence or adverse consequences, and that Defendant was not coerced in any way. (Tr. 25:23-26:2.) He also testified that the agents made no promises to Defendant and that they did not tell the Defendant that he would not be prosecuted. (Tr. 25:6-10.) Special Agent Shelley testified that no weapons were displayed at the interview and that the agents did not use any psychological coercion or make any promises to the Defendant. (Tr. 78:12-15; 78:20-22.) He stated that Defendant was not threatened with violence or coerced as a means of securing his participation. (Tr. 79:7-13.) Special Agent Shelley also testified that Defendant Kim was not told at the interview that he would not be prosecuted. (Tr. 78:17-19.)

Special Agent Shelley stated that, for the interviews in which he was involved, Defendant was allowed to terminate the interview, even if the agents had further questions. (Tr. 89:13-90:3.) Special Agent Armstead also testified that Defendant was the one that decided to end the interview, and that the agents neither attempted to stop Defendant from leaving nor pursued him after his departure. (Tr. 24:7-14.)

This Court finds that Defendant was not in custody for the purposes of *Miranda* and under such circumstances Defendant could not have been entitled to its protections. Indeed, the interview environment simply had "none of the earmarks of coercion...." *Elstad*, 470 U.S. at 316. There is simply no evidence from the record that Defendant was placed in the sort of coercive environment against which *Miranda* was designed to protect. Furthermore, as this Court is not apprised of any preceding taint, the Court is not prepared to suppress any material gained as a consequence of Defendant's statements on that day on this basis of it having been "fruit of the poisonous tree." Finally, as Defendant had not been charged with any of the instant offenses, his Sixth Amendment right to counsel was not violated.

### 2. June 21, 2012 Interview

According to Special Agent Armstead, this interview took place in the parking lot of the International House of Pancakes in Centreville, Virginia. The location was chosen by the Defendant. Present at that interview were Special Agent Armstead, Special Agent Shelley, and Defendant Kim. (Tr. 23:16-22; Ex. 14.) According to Special Agent Armstead, the interview lasted approximately thirty minutes. (Tr. 24:15-16.) Special Agent Armstead stated that Defendant was neither in custody, nor handcuffed, nor arrested during or after of the interview. (Tr.

23: 1-6.)  Special Agent Armstead testified that neither he nor other agents attempted to stop Defendant Kim from leaving the interview, and that Defendant was not pursued at the end of the interview.  (Tr. 23: 9-12.)  Special Agent Shelley also testified that Defendant was not handcuffed during the interview, or arrested or pursued at its conclusion.  (Tr. 77:15-78:2.)

According to Special Agent Shelley, the agents were "relaxed," "cordial," and "friendly" in demeanor, and the agents did not raise their voices at Defendant Kim or use profanity.  (Tr. 78:3-11.)  Special Agent Armstead also testified that the agents did not use profanity, raise their voices, or yell during the interview.  (Tr. 24:22-25:2.)  Special Agent Armstead stated that the agents' respective demeanors were "pleasant and friendly."  (Tr. 24:17-21.)  Agent Shelley testified that Defendant Kim's demeanor at the interview was "relaxed, very forthcoming, and cooperative" and that Defendant did not state that he did not wish to participate or ask for an attorney.  He did not refuse to answer questions.  (Tr. 78:23-79:6.) Special Agent Armstead also stated that the Defendant was "friendly." (Tr. 25:14-15.)  He further stated that Defendant did not object to the interview, nor did he refuse to speak with the agents or answer any questions. Defendant never asked for an attorney. (Tr. 25:14-22.)  During this interview Defendant made several incriminating statements.  (Ex. 14.)

Agent Shelley stated that, for the interviews in which he was involved, Defendant was allowed to terminate the interview, even if the agents had further questions. (Tr. 89:13-90:3.) Special Agent Armstead also testified that Defendant was the one that decided to end the interview, and that the agents neither attempted to stop Defendant from leaving nor pursued him after his departure. (Tr. 24:7-14.)

Special Agent Armstead stated that no weapons were displayed during the interview and that Defendant was not psychologically coerced in any way. (Tr. 25:3-5; 25: 11-13.) He testified that the agents did not threaten Defendant with violence or adverse consequences, and that Defendant was not coerced in any way. (Tr. 25:23-26:2.) He also testified that the agents made no promises to Defendant and that they did not tell the Defendant that he would not be prosecuted. (Tr. 25:6-10.) Special Agent Shelley testified that no weapons were displayed at the interview and that the agents did not use any psychological coercion, and that they did not make any promises to the Defendant. (Tr. 78:12-15; 78:20-22.) He stated that Defendant was not threatened with violence or coerced as a means of securing his participation. (Tr. 79:7-13.) Special Agent Shelley also testified that Defendant Kim was not told at the interview that he would not be prosecuted. (Tr. 78:17-19.)

At this interview, Defendant provided certain
information relating to the extortion activities and gang-
related activities of Han Sa Yu, Tae Won Kang, and Je Hyung Yoo.
(Ex. 14.)  Agent Shelley testified that, to the best of his
recollection, Defendant did not make any incriminating
statements about his own activities, and only incriminated Han
Sa Yu in the interview.  (Tr. 86:18-88:2.)

     This Court finds that Defendant was not in custody for
the purposes of *Miranda* and under such circumstances Defendant
could not have been entitled to its protections.  It simply
cannot be said that the record reflects any likelihood of
coercion. Furthermore, as this Court is not apprised of any
preceding taint, the Court is not prepared to suppress any
material gained as a consequence of Defendant's statements on
that day on this basis of it having been "fruit of the poisonous
tree."  Finally, as Defendant had not been charged with any of
the instant offenses, his Sixth Amendment right to counsel was
not violated.

### 3. August 9, 2012 Interview

     According to the testimony of Special Agent Shelley
and Special Agent Jeffery Roberts, Special Agent Shelley was the
one that arranged this interview by calling the Defendant over
the telephone. The interview took place at Fair City Mall in
Fairfax, Virginia, a location chosen by the Defendant, and

lasted approximately thirty minutes.  Defendant, Special Agent
Shelley, and Special Agent Roberts were present at the interview.
(Tr. 73:5-19; 93:1-14.)  Special Agent Roberts testified that
the participants sat in a government vehicle during the
interview.  (Tr. 93:10-11.)  Defendant's *Miranda* rights were not
recited.  (Tr. 86:6-10.)  Defendant was not handcuffed during
the interview, or arrested or pursued at its conclusion.  (Tr.
77:15-78:2; 93:20-21.)  According to Special Agent Shelley, the
agents were "relaxed," "cordial," and "friendly" in demeanor,
and the agents did not raise their voices at Defendant Kim or
use profanity.  (Tr. 78:3-11.)  Special Agent Roberts also
testified that the agents did not speak "harshly" to Defendant.
(Tr. 94:4-5.)  Agent Shelley testified that Defendant Kim's
demeanor at the interview was "relaxed, very forthcoming, and
cooperative" and that Defendant did not state that he did not
wish to participate or ask for an attorney.  He did not refuse
to answer questions.  (Tr. 78:23-79:6.)  Special Agent Roberts
testified that Defendant never indicated that the interview was
involuntary on his part.  (Tr. 94:18-20.)  Agent Shelley stated
that, for the interviews in which he was involved, Defendant was
allowed to terminate the interview, even if the agents had
further questions.  (Tr. 89:13-90:3.)  During this interview
Defendant made several incriminating statements.  (Ex. 15.)
Special Agent Roberts testified that Defendant terminated the

interview, stating that he had to return to his church group at a nearby restaurant, at which point he was allowed to leave. Special Agent Roberts testified that the agents made no effort to impede him, arrest him, or prevent him from leaving. (Tr. 94:13-95:1.)

Both Special Agent Shelley and Special Agent Roberts testified that no weapons were displayed at the interview and that the agents did not use any psychological coercion or make any promises to Defendant. (Tr. 78:12-15; 78:20-22; 94:6-9.) Special Agent Roberts also testified that Defendant was not forced to answer questions. (Tr. 93:22-24.) The agents testified that Defendant was not threatened with violence or coerced as a means of securing his participation. (Tr. 79:7-13; 93:25-94:12.) Special Agent Shelley also testified that Defendant Kim was not told at the interview that he would not be prosecuted. (Tr. 78:17-19.) However, Special Agent Roberts testified that, in setting up the interview, it was never their intent to arrest Defendant and that he was not in custody during the interview. (Tr. 93:15-19.)

This Court finds that Defendant was not in custody for the purposes of *Miranda* and under such circumstances Defendant could not have been entitled to its protections. Furthermore, as this Court is not apprised of any preceding taint, the Court is not prepared to suppress any material gained as a consequence

of Defendant's statements on that day on this basis of it having been "fruit of the poisonous tree." Finally, as Defendant had not been charged with any of the instant offenses, his Sixth Amendment right to counsel was not violated.

### 4. August 10, 2012 Interview

According to the testimony of Special Agent Shelley, the August 10 interview was conducted over the telephone and amounted to no more than a few minutes. (Tr. 73:20-25.) Defendant's *Miranda* rights were not recited. (Tr. 86:6-17.) During this interview Defendant made several incriminating statements. (Ex. 17.)

This Court finds that Defendant was not in custody for the purposes of *Miranda* and under such circumstances Defendant could not have been entitled to its protections. The phone call described simply cannot in any way be construed as "custody." The Court finds that the statements made by Defendant in the interview were freely and voluntarily made. Furthermore, as this Court is not apprised of any preceding taint, the Court is not prepared to suppress any material gained as a consequence of Defendant's statements on that day on this basis of it having been "fruit of the poisonous tree." Finally, as Defendant had not been charged with any of the instant offenses, his Sixth Amendment right to counsel was not violated.

### 5. August 15, 2012 Interview

According to the testimony of Special Agent Shelley and Special Agent Roberts, the August 15 interview was conducted in in the United States Attorney's Office for the Eastern District of Virginia in Alexandria, Virginia. Specifically, it was conducted in one of the conference rooms. (Tr. 95:21-96:10.) Special Agent Shelley set up the interview, although he was not present for its entirety. (96:13-14.) Present at the interview were Special Agent Shelley, assistant United States attorney Michael Frank, Special Agent Jeffrey Roberts, Mr. Kim, and Mr. Kim's mother. There is some dispute over the precise length of the interview, though no witness testified that it was longer than one hour and a half. (Tr. 74:20-75:24; 98:23-25.) Special Agent Roberts testified that Mr. Frank informed the Defendant that he was not under arrest. (Tr. 96:20-23.) According to Special Agent Shelley, the agents were "relaxed," "cordial," and "friendly" in demeanor, and the agents did not raise their voices at Defendant Kim or use profanity. (Tr. 78:3-11.) Special Agent Roverts also testified that the agents did not speak "harshly" to Defendant. (Tr. 98:4-5.) Agent Shelley testified that Defendant Kim's demeanor at the interview was "relaxed, very forthcoming, and cooperative" and that Defendant did not state that he did not wish to participate or ask for an attorney. He did not refuse to answer questions. (Tr. 78:23-79:6.) Special Agent Shelley stated that, for the

interviews in which he was involved, Defendant was allowed to terminate the interview, even if the agents had further questions. (Tr. 89:13-90:3.) Special Agent Roberts testified that stated that Defendant was expressly advised that he was not in custody and that he was free to leave. (Tr. 97:9-11.) Special Agent Roberts testified that at no time did Defendant indicate the interview was involuntary on his part or object to the interview, except when Defendant's mother had to leave to go to work, thereby causing the interview to end. (Tr. 98:13-19.) Special Agent Roberts also testified that it was never the agents' intent to arrest Defendant and that he was not in custody during the interview. (Tr. 96:15-19.) During this interview Defendant made several incriminating statements. (Ex. 18.)

Both Special Agent Shelley and Special Agent Roberts testified that Defendant was not handcuffed during the interview, or arrested or pursued at its conclusion. (Tr. 77:15-78:2; 97:20-21; 99:1-3.) Both agents testified that no weapons were displayed at the interview and that the agents did not use any psychological coercion or make any promises to Defendant. (Tr. 78:12-15; 78:20-22; 98:6-12.) The agents testified that Defendant was not threatened with violence, struck, or coerced as a means of securing his participation. (Tr. 79:7-13; 97:25-98:3.) Special Agent Shelley also testified that Defendant Kim

was not told at the interview that he would not be prosecuted. (Tr. 78:17-19.)

This Court finds that Defendant was not in custody for the purposes of *Miranda* and under such circumstances Defendant could not have been entitled to its protections.  The entire interview was free of coercion.  Furthermore, as this Court is not apprised of any preceding taint, the Court is not prepared to suppress any material gained as a consequence of Defendant's statements on that day on this basis of it having been "fruit of the poisonous tree."  Finally, as Defendant had not been charged with any of the instant offenses, his Sixth Amendment right to counsel was not violated.

### 6. September 3, 2012 Interview

According to the testimony of Special Agent Shelley, the August 10 interview was conducted over the telephone and amounted to no more than a few minutes.  (Tr. 75:25-76:15.)

This Court finds that Defendant was not in custody for the purposes of *Miranda* and under such circumstances Defendant could not have been entitled to its protections.  The phone call described simply cannot in any way be construed as "custody." Furthermore, as this Court is not apprised of any preceding taint, the Court is not prepared to suppress any material gained as a consequence of Defendant's statements on that day on this basis of it having been "fruit of the poisonous tree."  Finally,

as Defendant had not been charged with any of the instant offenses, his Sixth Amendment right to counsel was not violated.

### 7. September 5-6, 2012 Arrest

Special Agent Roberts testified that the arrest of Defendant took place September 5, through midnight, and on into the morning of September 6. (Tr. 100:25-101:5.) Special Agent Shelley testified that Defendant Kim was in custody for this interview. (Tr. 79:20-21.) According to both Special Agent Armstead and Special Agent Shelley, Defendant was provided with a *Miranda* warning on this occasion by Special Agent Roberts, both orally and in writing, and that Defendant stated that he understood his rights and initialed the Statement of Rights document (Tr. 28:14-29:2; 79:24-80:21; Ex. 20.) Special Agent Roberts corroborated these accounts. (Tr. 100:1-10.) Both agents testified that subsequent to having received those warnings, and in the absence of any coercion or coercive promises, Defendant signed a *Miranda* waiver form. (Tr. 29:4-30:10.; 80:22-81:4; Ex. 20.) The record does not reflect what statements were made by the Defendant after his arrest and waiver of *Miranda*, if any.

### 8. Credibility of Witnesses

During the suppression hearing on Defendant's Motion, this Court heard the testimony of Special Agent Marc Armstead, Special Agent Brendan Shelley, Special Agent Jeffery

Roberts, Ronna Rossi, record supervisor of Rappahannock Regional Jail. Their individual credibility was not put in issue by either party. This Court finds their individual testimony to have been sufficiently credible.

Defendant's counsel for the purposes of his immigration matters, Michael Lin, had spoken with Special Agent Shelley prior to several of the interviews in which Defendant participated. He testified that he would not have let him speak with the agents if he had known it would have led to Defendant's prosecution. (Tr. 114:21-24.) However, Special Agent Armstead testified that the agents made no promises to Defendant and that they did not tell the Defendant that he would not be prosecuted. (Tr. 25:6-10.) Mr. Lin also testified on cross-examination that Special Agent Shelley did not represent to Mr. Lin that Defendant would not be prosecuted by the federal government. (Tr. 116:19-21.) Special Agent Shelley also testified that Defendant Kim was not told that he would not be prosecuted. (Tr. 78:17-19.) This Court finds that the agents are more credible as to this point.

## IV. Conclusion

This Court concludes that Defendant's statements were freely and voluntarily made. For the foregoing reasons, Defendant Kwang Hee Kim's Combined Motion and Memorandum to Suppress is denied.

An appropriate Order will issue.

/s/
James C. Cacheris
November 20, 2012
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE